1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

GARY ROBINSON,

                                 Plaintiff,

       v.

LUIS LANDA, et. al.,

                              Defendants.

3:12-cv-00525-MMD-WGC

**REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

12

13

14

15

         This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is Defendants' Motion for Summary Judgment (Doc. # 83).[1] Plaintiff has not filed a response.

16

17

18

19

20

21

22

         On October 16, 2014, the court vacated Plaintiff's deadline to respond to the motion pending Defendants' compliance with the court's orders regarding production of an attorney sign-in visiting sheet or log. (*See* Doc. # 86.) Defendants indicated their compliance, by providing a supplemental response to the relevant request for production indicating no such document exists. (*See* Doc. # 87.) As a result, the court ordered Plaintiff to respond to Defendants' motion for summary judgment on or before November 21, 2014 (Doc. # 88); however, no response was ever filed.

23

         After a thorough review, the court recommends that Defendants' motion be granted.

24

**I. BACKGROUND**

25

26

         Plaintiff, a pro se individual proceeding in forma pauperis, brings this action pursuant to 28 U.S.C. § 1983. (Am. Compl., Doc. # 4; *see also* Doc. # 9, order screening Pl.'s Am. Compl.)

27

28

---

[1] Refers to court's docket number.

1    Defendants are Luis Landa, Lincoln Fay, Lee Dove and John Rogers, who were all employed by
2    the Humboldt County Sheriff's Department at the time of the incident. (*Id.*)

3         Plaintiff's complaint alleges that on June 17, 2011, he had a domestic argument with his
4    wife, which caused his grandson (Isaiah Paavola) to call the Humboldt County Sheriff's
5    Department. (Doc. # 4 at 4.) Thereafter, Defendants arrived at his home. (*Id.*) Plaintiff avers that
6    he waved his hands in the air and told the Defendants he was unarmed, and the Defendants then
7    approached his property. (*Id.*) He claims that Landa proceeded to grab Plaintiff's right wrist to
8    put restraints on him, while telling Plaintiff he was going to prison. (*Id.* at 5.) Landa then began
9    to "yank and pull" on Plaintiff's right arm, and Plaintiff maintains he reacted but did not resist.
10   (*Id.*)

11        Plaintiff then alleges that Fay came onto the deck and "joined in" and while Plaintiff was
12   being "jostled" between the two deputies, Dove slipped down the stairs of the deck and landed
13   on the ground by Plaintiff's dog. (*Id.* at 5-6.) Plaintiff contends that the dog was upset about the
14   circumstances, and bit Dove, but he was not seriously injured. (*Id.* at 6.)  Fay drew his weapon
15   and shot Plaintiff's dog. (*Id.* at 6.) Plaintiff goes on to allege that Fay then shot Plaintiff with his
16   taser darts, but before they were activated, Plaintiff yanked the darts out with his left hand. (*Id.*)

17        Plaintiff asserts that he was old and not in physical shape to engage in physical combat,
18   and did not pose an immediate threat to anyone. (*Id.* at 7.) Plaintiff avers that Fay then jumped
19   on his back and Dove drove him to the ground, and while he was on the ground with his right
20   arm restrained, Landa started kicking him in the left side of his face which resulted in a fracture
21   to his "left lower eye orbit (socket)" and caused his left eye to fall out. (*Id.* at 8.) Plaintiff claims
22   that Fay and Dove were on his back, hitting Plaintiff with their fists and nightsticks and kicking
23   and punching him in the ribs and back of the head. (*Id.*)  Plaintiff alleges that Rogers then arrived
24   and did nothing to stop the abuse. (*Id.*) Plaintiff states that he was taken to the hospital and saw a
25   plastic surgeon who re-attached his eye muscle. (*Id.* at 9.)

26        Based on these allegations, Plaintiff was allowed to proceed with a claim for excessive
27   force under the Fourth Amendment in Count I, as well as his State common law claims for
28   assault and battery in Count II against Defendants. (*See* Docs. # 3, # 5, # 9.)

1    Defendants move for summary judgment. (Doc. # 83.) They argue that the force used

2    against Plaintiff was objectively reasonable under the circumstances. As the court indicated

3    above, Plaintiff did not file a response. Notwithstanding Plaintiff's failure to respond to the

4    motion, the court may not grant Defendants' motion on this basis alone. *See Heinemann v.*

5    *Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013). The court must review Defendants' motion and

6    ensure they have met their burden under Federal Rule of Civil Procedure 56. The court may,

7    however, consider the facts set forth by Defendants as undisputed. *Id.*

8                              **II. SUMMARY JUDGMENT STANDARD**

9    "The purpose of summary judgment is to avoid unnecessary trials when there is no

10   dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

11   F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

12   judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

13   525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

14   (1986). "The court shall grant summary judgment if the movant shows that there is no genuine

15   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

16   Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

17   issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

18   250 (1986).

19           A party asserting that a fact cannot be or is genuinely disputed must support the
             assertion by:
20           (A) citing to particular parts of materials in the record, including depositions,
             documents, electronically stored information, affidavits or declarations,
21           stipulations (including those made for purposes of the motion only), admissions,
             interrogatory answers, or other materials; or
22           (B) showing that the materials cited do not establish the absence or presence of a
             genuine dispute, or that an adverse party cannot produce admissible evidence to
23           support the fact.

24   Fed. R. Civ. P. 56(c)(1)(A), (B).

25           If a party relies on an affidavit or declaration to support or oppose a motion, it "must be

26   made on personal knowledge, set out facts that would be admissible in evidence, and show that

27   the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

28

1    In evaluating whether or not summary judgment is appropriate, three steps are necessary:

2    (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as

3    to a material fact; and (3) considering the evidence in light of the appropriate standard of proof.

4    *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect

5    the outcome of the suit under the governing law will properly preclude the entry of summary

6    judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

7    In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

8    "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

9    come forward with evidence which would entitle it to a directed verdict if the evidence went

10   uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing

11   the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

12   *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

13   omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

14   defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

15   an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party

16   failed to make a showing sufficient to establish an element essential to that party's case on which

17   that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-

18   25 (1986).

19   If the moving party satisfies its initial burden, the burden shifts to the opposing party to

20   establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

21   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of

22   material fact, the opposing party need not establish a genuine dispute of material fact

23   conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a

24   jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc.*

25   *v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation

26   omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the

27   non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith*

28   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid

summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

## III. DISCUSSION

### A. Facts

In support of their motion, Defendants have submitted evidence of the following facts:

On June 17, 2011, Plaintiff's wife, Wanda Robinson, was at her home in Winnemucca, Nevada with her grandson Isaiah Paavola. (W. Robinson Aff., Doc. # 83-1 at 2 ¶¶2-3.) Plaintiff arrived at the residence, and Mrs. Robinson could tell he had been drinking, and they began to argue. (*Id*. ¶3.) Plaintiff told Mrs. Robinson "to shut up or he would knock the fuck out of [her]." (*Id*. ¶ 4.) She told Plaintiff to shut up, and he then pushed her up against a window with such force that the window broke. (*Id*. at 3 ¶ 5.) Plaintiff began hitting Mrs. Robinson in the face, stomach and arms and called her derogatory names. (*Id*. ¶¶ 6-7.) Plaintiff then pushed Mrs. Robinson onto the bed and told her to "shut the fuck up or he would break [her] neck." (*Id*. ¶ 8.) He stopped beating her and told Paavola to "get the fuck out of his house," and Mrs. Robinson told him she just needed to get her money and some of her clothes. (*Id*. ¶ 9.) Plaintiff would not

1    let her gather her things and ordered them to "get the fuck out." (*Id.*) During the altercation, she

2    discovered that Paavola had called the Humboldt County Sheriff's Office. (*Id.* ¶ 10.) Plaintiff

3    forced Mrs. Robinson and Paavola out of the house, and they waited for the authorities to arrive.

4    (*Id.* ¶ 11.) When the deputies arrived in front of the residence, she told them Plaintiff had been

5    drinking, had punched her numerous times, and had access to firearms in the house. (*Id.* ¶ 12.)

6            At 3:42 on June 17, 2011, Dove, Fay, Landa and Rogers were dispatched to Plaintiff's

7    residence as there was a report of a domestic battery in progress. (Dove Aff.,

8    Doc. # 83-1 at 5 ¶ 3; Fay Aff., Doc. # 83-1 at 10 ¶ 3; Landa Aff., Doc. # 83-1 at 14 ¶ 3; Rogers

9    Aff., Doc. # 83-1 at 20 ¶ 3.) The dispatcher advised them that Plaintiff had firearms, had been

10   drinking, and was battering the victim, Mrs. Robinson. (Dove Aff., Doc. # 83-1 at 5 ¶ 4; Fay

11   Aff., Doc. # 83-1 at 10 ¶ 4; Landa Aff., Doc. # 83-1 at 14 ¶ 4; Rogers Aff., Doc. # 83-1 at 20

12   ¶ 4.) More specifically, it was relayed that the dispatcher could hear a male voice yelling

13   obscenities; Mrs. Robinson informed the dispatcher she had been hit several times and pushed

14   into a window causing it to break; that she had been kicked out of the house; and that Plaintiff

15   had locked himself into the house where he had access to weapons. (Dove Aff., Doc. # 83-1 at 5

16   ¶ 4; Fay Aff., Doc. # 83-1 at 10 ¶ 4; Landa Aff., Doc. # 83-1 at 14 ¶ 4; Rogers Aff., Doc. # 83-1

17   at 20 ¶ 4.) Dove also learned prior to their arrival from Undersheriff Curtiss Kull that Plaintiff

18   had violent tendencies. (Dove Aff., Doc. # 83-1 at 6 ¶ 5.) Landa had previously been to the

19   residence and observed that Plaintiff was in complete opposition to any law enforcement. (Landa

20   Aff., Doc. # 83-1 at 15 ¶ 5.)

21           When they arrived, Mrs. Robinson and Paavola came to the patrol cars, approximately

22   seventy-five yards from the residence, and Mrs. Robinson informed Fay that Plaintiff had hit her

23   and Fay observed she had a bloody lip. (Fay Aff., Doc. # 83-1 at 11 ¶ 5.) Mrs. Robinson also

24   relayed that Plaintiff had been drinking and had become very angry for no reason. (Rogers Aff.,

25   Doc. # 83-1 at 21 ¶ 6.) Landa spoke with Paavola, who said that Plaintiff had been yelling and

26   breaking things around the house, and then pushed, shoved and hit Mrs. Robinson, and forced

27   them out of the house. (Landa Aff., Doc. # 83-1 at 15 ¶ 7.) Paavola also informed Landa that

28   Plaintiff had a shotgun and a pistol. (*Id.*) Mrs. Robinson confirmed to Landa that Plaintiff had

1    punched her several times and pushed her against a window, breaking the glass. (Landa Aff.,

2    Doc. # 83-1 at 15  ¶ 8; Rogers Aff., Doc. # 83-1 at 21 ¶ 7.) She also told Landa that Plaintiff told

3    her if she called the cops "he would kill her and her fucking family[.]" (Landa Aff., Doc. # 83-1

4    at 15 ¶ 9.) Landa observed a reddish purple abrasion on the right side of Mrs. Robinson's face, a

5    swollen lip, an open cut on her inner lip, a significant amount of blood coming out of her mouth,

6    and several red discolorations on her upper arms and lower extremities. (*Id*. ¶ 10.)

7         Dove observed Plaintiff standing on the porch, and made several attempts to have

8    Plaintiff walk over to the patrol units, but he would not oblige. (Dove Aff., Doc. # 83-1 at 6 ¶ 8.)

9         Dove and Landa then approached the house to speak with Plaintiff and get his side of the

10   story, with Fay close behind. (Dove Aff., Doc. # 83-1 at 6 ¶¶ 9-10; Rogers Aff., Doc. # 83-1 at

11   21  ¶ 10; Fay Aff., Doc. # 83-1 at 11 ¶ 6; Fay Aff., Doc. # 83-1 at 15 ¶ 13.) Rogers stayed behind

12   with Mrs. Robinson and Paavola at the patrol cars while they finished writing down their

13   statements. (*Id*.) As Dove and Landa approached, Plaintiff appeared belligerent and began

14   cussing at them. (Dove Aff., Doc. # 83-1 at 6 ¶ 9.) They tried to reason with Plaintiff, but he told

15   his dog, a pit bull, to attack them. (Dove Aff., Doc. # 83-1 at 6 ¶ 10; Fay Aff., Doc. # 83-1 at 11

16   ¶ 6; Landa Aff., Doc. # 83-1 at 15 ¶ 13.) The dog got about fifteen feet from Fay before Plaintiff

17   called it off. (Fay Aff., Doc. # 83-1 at 11 ¶ 6.) When Fay got up to the house, Plaintiff was on the

18   porch and the door to the house (which they had been told contained weapons) was open. (Fay

19   Aff., Doc. # 83-1 at 11 ¶ 7.) As they approached, Landa noticed that Plaintiff had a large pocket

20   knife hanging from his pant pocket. (Landa Aff., Doc. # 83-1 at 16 ¶ 14.)

21        They asked Plaintiff to allow them to get some personal items for Mrs. Robinson so they

22   could leave, but he refused, called Mrs. Robinson a derogatory name, and told them to "take the

23   fucking bitch away." (Dove Aff., Doc. # 83-1 at 6 ¶ 12.) When Landa attempted to explain why

24   they were there, Plaintiff responded: "get the fuck off my property, you fucking Mexican."

25   (Landa Aff., Doc. # 83-1 at 16 ¶ 15.) Landa continued to try to get Plaintiff's side of the story

26   and Plaintiff said: "Yeah, I pushed the motherfucker so what, take the motherfucker away, I am

27   tired of supporting her fucking lazy ass, her grandson and her daughter; I am tired of all you

28   motherfuckers so leave." (Landa Aff., Doc. # 83-1 at 16 ¶ 16.) Based on hearing

1   Mrs. Robinson's statements, observing her injuries, and listening to Plaintiff admit to pushing

2   her, Landa concluded Plaintiff had been the primary aggressor in the domestic disturbance.

3   (Landa Aff., Doc. # 83-1 at 16 ¶ 18.)

4        Land and Dove told Plaintiff that they were placing him under arrest, to which Plaintiff

5   replied: "come up here and you'll find out what happens" and "fuck you motherfuckers, like hell

6   you will." (Dove Aff., Doc. # 83-1 at 6 ¶ 13; Landa Aff., Doc. # 83-1 at 16 ¶ 19.) Plaintiff then

7   stepped back into a fighting stance and balled up his fists. (*Id*.) He also turned around and took a

8   couple of quick steps to his door. (Landa Aff., Doc. # 83-1 at 16 ¶ 19.) Landa and Dove climbed

9   the steps in an attempt to place Plaintiff under arrest. (Landa Aff., Doc. # 83-1 at 16 ¶ 20.) Landa

10  and Dove then both pulled out their tasers and pointed them at Plaintiff. (Dove Aff., Doc. # 83-1

11  at 6 ¶ 14.) It then appeared Plaintiff was going to comply so Dove holstered his taser "and went

12  hands on." (Dove Aff., Doc. # 83-1 at 7 ¶ 15.) Dove walked up onto the deck and grabbed

13  Plaintiff's right wrist and told Plaintiff he was going to place him in handcuffs, while Landa

14  attempted to grab his left arm. (Dove Aff., Doc. # 83-1 at 7 ¶ 15; Landa Aff., Doc. # 83-1 at 16

15  ¶ 20.)

16       Next, Dove recalls that everything went black and he saw flashes of bright light. (Dove.

17  Aff., Doc. # 83-1 at 7 ¶ 15.) According to Fay and Landa, Plaintiff struck Dove in the jaw,

18  knocking him down. (Fay Aff., Doc. # 83-1 at 11 ¶ 9; Landa Aff., Doc. # 83-1 at 16 ¶ 20.) Landa

19  then deployed his taser and shot Plaintiff, hitting him "center mass," which temporarily

20  incapacitated Plaintiff. (Landa Aff., Doc. # 83-1 at 16-17 ¶ 21.)

21       Fay, Landa and Dove tried to get Plaintiff into handcuffs, but he continued to resist as the

22  effects of the taser began to wear off. (Dove Aff., Doc. # 83-1 at 7 ¶ 17; Fay Aff., Doc. # 83-1 at

23  11 ¶¶ 9, 10; Landa Aff., Doc. # 83-1 at 17 ¶ 21.) Plaintiff then attempted to punch Landa and

24  Dove. (Landa Aff., Doc. # 83-1 at 17 ¶ 21.) Landa delivered a stun with his taser directly to

25  Plaintiff's body which caused him to collapse onto the railing, and his head collided with the

26  corner post hitting his left eye, and then his entire body fell down the stairs to the ground. (Landa

27  Aff., Doc. # 83-1 at 17 ¶ 22.)

28

- 8 -

1    Dove recalls tumbling off the porch to the ground with Plaintiff, who continued to fight

2    and resist Dove. (Dove Aff., Doc. # 83-1 at 7 ¶ 16.) The effects of the taser began to wear off and

3    Plaintiff continued to push, shove and kick the officers. (Landa Aff., Doc. # 383-1 at 17 ¶ 23.)

4    Plaintiff began yelling "get them, get them" to his dog. (Fay Aff., Doc. # 83-1 at 11 ¶ 9; Landa

5    Aff., Doc. # 83-1 at 17 ¶ 24.)

6    Dove changed his body position because he thought Plaintiff was going to reach for his

7    gun, and felt a pain on his left leg which turned out to be Plaintiff's pit bull biting his leg. (Dove

8    Aff., Doc. # 83-1 at 7 ¶ 18.) Fay took his baton out and struck the pit bull. (Fay Aff., Doc. # 83-1

9    at 11 ¶ 10.) The dog backed away for a moment and began to return for a second attack, at which

10   point Fay shot the dog in the chest, killing it. (Fay Aff., Doc. # 83-1 at 11 ¶ 10.) At this point,

11   Dove yelled to Rogers for help and he ran to the scene. (Rogers Aff, Doc. # 83-1 at 21-22 ¶ 15.)

12   While this was occurring, Landa tried to contain Plaintiff's movements, and observed Plaintiff

13   trying to reach into his pants pocket where Landa had seen the large pocket knife. (Landa Aff.,

14   Doc. # 83-1 at 17 ¶ 26.)

15   Due to his injuries, Dove crawled away from the altercation, but Landa and Fay were

16   eventually able to get Plaintiff in handcuffs. (Dove Aff., Doc. # 83-1 at 7 ¶ 20; Fay Aff., Doc.

17   # 83-1 at 11-12 ¶ 11; Landa Aff., Doc. # 83-1 at 17 ¶ 28.) Dove was transported to Humboldt

18   General Hospital and was treated for a sprained and potentially dislocated jaw and torn calf. (*Id*.

19   ¶ 23.)

20   **B. Fourth Amendment Excessive Force-Legal Standard**

21   Claims of excessive force during an arrest or other seizure of a free citizen are evaluated

22   under the Fourth Amendment and apply an "objective reasonableness" standard. *Graham v.*

23   *Connor*, 490 U.S. 386, 395 (1989) (internal quotation marks omitted); *see also Smith v. City of*

24   *Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (en banc) ("A Fourth Amendment claim of excessive

25   force is analyzed under the framework outlined by the Supreme Court in *Graham v. Connor*.").

26   This analysis "requires a careful balancing of 'the nature and quality of the intrusion on the

27   individual's Fourth Amendment interests' against the countervailing governmental interests at

28   stake." *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted). The question is

1   "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

2   confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (citations

3   omitted). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest

4   ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to

5   effect it." *Id*. at 396 (citation omitted).

6            The objective reasonableness inquiry "requires careful attention to the facts and

7   circumstances of each particular case, including the severity of the crime at issue, whether the

8   suspect poses an immediate threat to the safety of the officers or others, and whether he is

9   actively resisting arrest or attempting to evade arrest by flight." *Id*. (citation omitted).

10  These factors are not exhaustive, and courts are "to examine the totality of the circumstances and

11  consider 'whatever specific factors may be appropriate in a particular case[.]'" *Bryan v.*

12  *MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876

13  (9th Cir. 1994)). Courts conduct their evaluation of reasonableness "from the perspective of a

14  reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490

15  U.S. at 396 (citation omitted).

16           "'Not every push or shove, even if it may later seem unnecessary in the peace of a

17  judge's chambers,' ... violates the Fourth Amendment." *Id*. (citation omitted). "The calculus of

18  reasonableness must embody allowance for the fact that police officers are often forced to make

19  split-second judgments−in circumstances that are tense, uncertain, and rapidly evolving−about

20  the amount of force that is necessary in a particular situation." *Id*. at 396-97.

21  **C. Analysis**

22           Plaintiff did not respond to the motion, so the court takes the facts presented by

23  Defendants as undisputed. *See Heinemann*, 731 F.3d at 917. The court will now assess whether,

24  in light of these facts, Defendants are entitled to summary judgment

25           First, the court will address the type and amount of force used, which includes Landa's

26  deployment of his taser (first with darts only, and then directly to Plaintiff) and Landa and Fay's

27  use of hands on force to restrain Plaintiff. As, Defendants point out, Landa deployed his taser in

28  dart mode after Plaintiff had refused to comply with the deputies' instructions, was physically

1    resisting arrest, was threatening the deputies, had told his dog to attack the deputies, and had

2    punched Dove in the face, knocking him down.

3         He delivered the taser directly to Plaintiff after the effects of the initial dart-tase wore off

4    and Plaintiff continued to fight the deputies, including attempts to punch Landa.

5         While the use of a taser has been held to constitute an "intermediate, significant level of

6    force that must be justified by the governmental interest involved," *Bryan v. MacPherson*, 630

7    F.3d 805, 809 (9th Cir. 2010), the court finds that Landa's use of the taser under these

8    circumstances was justified. Plaintiff had hit one of the deputies in the face, knocking him to the

9    ground, had access to weapons inside the house, continued to threaten and resist the deputies in

10   their efforts to place Plaintiff in restraints, and ordered his dog to attack them. This is

11   distinguishable from *MacPherson* where the plaintiff was unarmed, made no threatening

12   statements or gestures, and did not attempt to resist or flee. *Id.* at 809.[2]

13        Dove grabbed Plaintiff's right arm in an attempt to handcuff Plaintiff, and at that point

14   Plaintiff punched Dove in the jaw. Landa and Fay continued using hands on force to try to gain

15   Plaintiff's compliance and secure him in handcuffs. Plaintiff continued to fight and resist, and

16   ordered his dog to attack and the dog bit Dove. Fay acknowledges that he punched Plaintiff in

17   the stomach in an attempt to get Plaintiff to roll over, but this was after Plaintiff had punched

18   Dove in the face and had fallen down the stairs from the deck and was still struggling with the

19   officers. (Doc. # 83 at 11.) After Plaintiff was on his stomach and Fay had control of Plaintiff's

20   right arm, Plaintiff continued to struggle and resist and give up his left arm to Landa to be

21   handcuffed, and Fay acknowledges that he struck Plaintiff on the right side of his face to compel

22   him to give up his left arm. (Doc. # 83 at 11.) The hands-on force used by Dove, Landa and Fay

23   was objectively reasonable under these circumstances.

24        Second, the court will assess the severity of the crime at issue: domestic battery.

25   Defendants were advised that Plaintiff had been drinking, was shouting obscenities and acting

26   belligerent, had punched and shoved a woman with such force that a window was broken, and

27   _____

28        [2] The Ninth Circuit ultimately found the officer was entitled to qualified immunity. *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010).

had access to firearms. The deputies were also able to observe Mrs. Robinson's injuries once they arrived. Plaintiff was ultimately convicted, after entry of a guilty plea, of the felonies of assault and battery with a deadly weapon. (Doc. # 83-1 at 29-33.) Thus, the court concludes that this factor weighs in favor of the use of force by the Defendants.

Third, the court will consider whether Plaintiff posed an immediate threat to the safety of the deputies at the time of the challenged conduct. This is the most important factor. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). The facts demonstrate that Plaintiff did pose an immediate threat to the safety of the deputies. The deputies were told by Mrs. Robinson that Plaintiff had punched her and shoved her with such force that a window was broken. They observed her injuries as a result of the incident. She also advised them that Plaintiff had been drinking and had access to weapons. From the time they approached the house, Plaintiff was combative, and Landa observed a large pocket knife in Plaintiff's pant pocket. He was standing on the porch, in close proximity to the house, where the weapons were supposedly located. Plaintiff ordered his dog to attack the deputies on various occasions. When the deputies tried to place Plaintiff under arrest, threatened them, resisted, and continued to act belligerently. When the deputies tried to place Plaintiff in handcuffs, he punched Dove in the face. He continued to resist arrest, and ordered his dog to attack the deputies, resulting in Dove's leg being bitten. Even after he was hit with the taser darts, Plaintiff continued to fight and resist the Defendants. The undisputed facts support the conclusion that the Defendants reasonably believed Plaintiff posed a threat to them. Therefore, this factor weighs in favor of the use of force by the Defendants.

Fourth, the court considers whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight. Here, there is no question that from the time the deputies notified Plaintiff of their intent to place him under arrest until they were able to secure him in handcuffs, he engaged in efforts to resist them. Therefore, this factor weighs in favor of the use of force by the Defendants.

1    Given these undisputed facts, the court concludes that Defendants' use of force was

2    objectively reasonable under the circumstances. In light of the court's conclusion, it need not

3    reach Defendants' qualified immunity argument.

4    **D. State Common Law Claims of Assault and Battery**

5    Assault is "[u]nlawfully attempting to use physical force against another person; or (2)

6    intentionally placing another person in reasonable apprehension of immediate bodily harm."

7    Nev. Rev. Stat. 200.471(1)(a). A battery is "any willful and unlawful use of force or violence

8    upon the person of another." Nev. Rev. Stat. 200.481(1)(a). In the context of an arrest, contact

9    may only constitute assault or battery if the officer "uses more force than is reasonably necessary

10   to effect a lawful arrest." *Yada v. Simpson*, 112 Nev. 254, 256-57, 913 P.2d 1261 (1996);

11   *Ramirez v. City of Reno,* 925 F.Supp. 681, 690 (D. Nev. 1996) (citing *Graham*, 490 U.S. 386

12   (1989)). Given the court's findings above, there is no factual dispute that the deputies used no

13   more force than was reasonably necessary to affect a lawful arrest. Therefore, summary

14   judgment should be granted in favor of Defendants as to Plaintiff's State common law claims of

15   assault and battery.

16   In light of this conclusion, the court need not address Defendants' discretionary act

17   immunity argument.

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING**

Defendants' motion for summary judgment (Doc. # 83).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

this Report and Recommendation within fourteen days of receipt. These objections should be

titled "Objections to Magistrate Judge's Report and Recommendation" and should be

accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of

appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

until entry of judgment by the district court.

DATED: May 21, 2015.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE